UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NORTHEASTERN DIVISION

| | | |
|---|---|---|
| JAMES R. HILLIS, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2:14-0033 |
| | ) | Judge Sharp |
| JOANNE CLOUSE, individually, | ) | |
| ROY PHIPPS, individually, and | ) | |
| GABE FRIZZELL, individually, | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM**

Pending before the Court is the Motion for Summary Judgment (Docket No. 20) filed by Defendants Joanne Clouse, Roy Phipps, and Gabe Frizzell, all Putnam County, Tennessee Sheriff's Deputies who are sued in their individual capacity for the alleged deprivation of Plaintiff James R. Hillis's civil rights. Plaintiff has responded in opposition to the Motion (Docket No. 36), and Defendants have replied (Docket No. 39). For the reasons that follow, Defendants' Motion will be granted in part and denied in part.

**I. FACTUAL BACKGROUND**

In support of their Motion for Summary Judgment, and in accordance with Local Rule 56.01(c), Defendants have filed a Statement of Material Facts to Which There is no Genuine Dispute. That Statement, based almost entirely on the Defendants' affidavits, reads:

> 1. Putnam County Deputy Sheriffs Roy Phipps, Gabe Frizzell and Joanne Clouse responded to a 911 call to the home of Sharon Gago located at 2039 Kayla Court in Cookeville, Tennessee as a result of a domestic disturbance created by James R. Hillis.
>
> 2. On arrival, Deputy Joanne Clouse went to speak with Sharon Gago and Deputy

1

Phipps and Deputy Frizzell went to interview James R. Hillis who was standing in his driveway near the edge of the street.

3. Deputy Roy Phipps instructed James R. Hillis to take his hands from his pockets on two separate occasions.

4. James R. Hillis had been drinking, and the Deputies smelled a strong odor of alcohol on Mr. Hillis as they approached him.

5. James R. Hillis did not remove his hands from his pockets.

6. Deputy Roy Phipps took Mr. Hillis' left arm to remove his hand from his pocket. At that time Mr. Hillis turned toward Deputy Phipps in a threatening and confrontational manner. At that time, Deputy Roy Phipps elected to arrest Mr. Hillis.

7. James R. Hillis resisted the arrest and refused to be handcuffed or be taken to the ground. He fought with the Deputies.

8. Ultimately, the Deputies were able to get Mr. Hillis on the ground, but he continued to resist. Deputy Joanne Clouse heard Mr. Hillis resisting from across the street; she ran across the street; she warned Mr. Hillis that if he did not cease resisting, he would be tased; he refused; and he was tased one time in the back (for 5 seconds).

9. The Deputies were then able to handcuff Mr. Hillis, and he was taken into custody.

10. The Putnam County Grand Jury indicted James R. Hillis for the charges for which he was arrested: violation of T.C.A. §39-16-602.

11. James R. Hillis went to the emergency room solely for the purpose of documenting his lawsuit. James R. Hillis' injuries were superficial, at best. He left the Emergency Department of Cookeville Regional Medical Center without completing an examination or treatment.

(Docket No. 22 at 1-3, citations to the record omitted).

There is, of course, another side to this story. According to Plaintiff's deposition testimony, when the squad cars rolled up, he was standing in his front yard next to the driveway, approximately 15 to 20 feet from the street. Plaintiff claims that, because it was cold and he was only wearing a t-shirt, he had his fingertips in his front pockets.

2

As the officer came across the road in a "fast walk," Plaintiff said, "Can I help you?" (Docket No. 35, Pf. Depo. at 82). Plaintiff admits that one of the officers told him to get his hands out of his pocket, but "by this time they were just almost right up in my face." He claims,

> they were standing right in from of me, two feet in front of me, and he [Deputy Phipps] shouted at me and said, "I said get your hands out of your pockets," and as I started to take my hands out – I had just cleared my pockets, they grabbed me and lunged on me and started trying to sling me on the ground.

(Id. at 83). Plaintiff further testified,

> they were walking extremely fast when they told me the first time and there was very little time elapsed between the time that they told me the first time and when he shouted it in a – in an authoritative tone and when he did that, I removed my hand out of my pockets as he asked.
>
> I just pulled my hands – cleared my pockets maybe three inches and then when they could see my hand, for no reason they just lunged at me.

(Id. at 86). Later he testified that Deputy Phipps "screamed at him" like a "drill sergeant" to take his hands out of his pockets, and that he was grabbed "instantly" after removing his hands as instructed. (Id. at 95 & 97).

Plaintiff admits that a struggle ensued, but claims he did not resist arrest. Rather, his reaction was "instinctive," as tried to keep his footing and avoid getting hurt.

Plaintiff claims that after he was "thrown" on the ground, he was kicked and kneed in the rib cage. His right arm "was injured pretty bad," but pinned beneath his body so he tried to lift up to release it. (Id. at 102 & 104). "Somebody" was "telling [Plaintiff] to put [his] hands behind his back" but "kept pushing [him] down and at the same time telling [him] to stay down or something[.]" (Id. at 102). At this point, Plaintiff heard a "a woman's voice [Deputy Clouse] saying, 'Get back, I'll taser the mother fucker [sic].'" (Id.).

3

Defendants have submitted a videotape/audio tape of the incident. The video portion adds almost nothing other than the black of night because it apparently is from a camera mounted on the dash of the second patrol car that faced forward while the altercation occurred to the left of camera.

The audiotape reflects that within a minute of arrival, Deputies approached Plaintiff. Plaintiff asked, "What can I do for you?" to which one of the officers responded, "what's going on over here?" The same officer then said, "take your hands out of your pockets." Plaintiff responded, "hey, hey, this is my property," the officer immediately replied, "your going to jail," Plaintiff said, "no I ain't," and the officer said, "you don't fuck with me."[1] A scuffle and yelling can then be heard, with the officers shouting at Plaintiff to get on the ground.

Scuffling and shouting can be heard for approximately five second, but then, for unexplained reasons, the audiotape goes silent for approximately 20 seconds. Apparently, Plaintiff was tased during this mysterious gap in the tape.

All told, approximately 15 seconds elapsed between the time Plaintiff first spoke with officers and the takedown. Less than six seconds elapsed between the time Plaintiff said this was "my property" and the altercation.

Plaintiff was subsequently indicted in state court for violating Tenn. Code Ann. § 39-16-602 which makes it "an offense for a person to intentionally prevent or obstruct anyone known to the person to be a law enforcement officer . . . from effecting a stop, frisk, halt, arrest or search of any person, including the defendant, by using force against the law enforcement officer or another." Plaintiff was granted pre-trial diversion, subject to the payment of $971.00 in fees and costs, and the

---

[1] It appears that officers told Plaintiff to take his hands out of his pockets on two occasions. However, the audiotape is not clear on this point because, throughout, a small dog can be heard barking in the background, making parts of the tape inaudible.

completion of six months probation.[2]

Plaintiff filed suit in this Court pursuant to 42 U.S.C. § 1983. He brings claims for illegal arrest and excessive force in violation of the Fourth Amendment to the United States Constitution. Defendants moves for summary judgment on both claims.

## II. **STANDARD OF REVIEW**

The standards governing summary judgment motions are well known. A party may obtain summary judgment if the evidence establishes there are no genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See FED. R. CIV. P. 56(c); Covington v. Knox Cnty. Sch. Sys., 205 F.3d 912, 914 (6th Cir. 2000). A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in his or her favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

## III. **APPLICATION OF LAW**

So far as relevant, 42 U.S.C. § 1983 provides:

"Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress."

42 U.S.C. § 1983. In order to state a claim under this statute, "a plaintiff must allege the violation

---

[2] Under Tennessee law, a defendant is "not required to admit his guilt to the . . . charges in order to be granted pretrial diversion" because "[n]either [the] pretrial diversion statute nor previous case decisions require an admission of guilt." Stanton v. State, 395 S.W.3d 676 (Tenn. 2013).

of a right secured by the Constitution or laws of the United States and must show that the deprivation of that right was committed by a person acting under color of state law." Harbin-Bey v. Rutter, 420 F.3d 571, 574 (6th Cir. 2005). Here, there is no dispute that each of the Defendants was acting under state law when they interacted with Plaintiff on April 4, 2013, and so the questions become whether any of the Deputies deprived Plaintiff of a right under the Fourth Amendment.

**A. Illegal Arrest Claim**

In response to Defendants' Motion for Summary Judgment, "Plaintiff agrees that his claim of illegal arrest is precipitated [sic] by the Sixth Circuit in Stanley v. City of Norton, 124 Fed App'x 305 ([6th Cir. 2005)]." (Docket No. 36 at 2). Given that Plaintiff does not argue the point further, and the fact that the Sixth Circuit in Stanley stated that "it is long settled that the finding of an indictment, fair upon its face, . . . conclusively determines the existence of probable cause" and disposes of any "action for false arrest," id. at 310, the Court will dismiss Plaintiff's illegal arrest claim.

**B. Excessive Force Claim**

In Graham v. Connor, the Supreme Court held "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard[.]" 490 U.S. 386, 395 (1989) (italics in original). The Court went on to hold that the reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight[.]" Id. at 396. "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." Id.

6

In making the reasonableness calculation, Graham instructs courts to look at the severity of the crime, whether the subject posed an immediate threat to the safety of the officers or others, and whether the subject was resisting arrest. Id. "In determining whether there has been a violation of the Fourth Amendment, [a court] considers not the 'extent of the injury inflicted,' but whether an officer subjects a detainee to 'gratuitous violence.'" Miller v. Sanilac Cnty., 606 F.3d 230, 252 (6th Cir. 2010)) (quoting Morrison v. Bd. of Tr. of Green Twp., 583 F.3d 394, 400 (6th Cir. 2009)).

Turning first to the takedown, Defendants argue that Plaintiff "refused to comply with a reasonable request of Deputy Phipps to show his hands for officer security" and "then turned confrontationally and in a threatening manner [towards] Deputy Phipps" at which point Plaintiff "was placed under arrest" and a "traditional 'take down was employed" which Plaintiff "resisted." (Docket No. 21 at 13. That is, "the intoxicated [Plaintiff's] failure to show his hand and his threatening turn toward Deputy Phipps fully justified taking him to the ground to be handcuffed[.]" (Id. at 15).

Defendants correctly note that "'Fourth Amendment jurisprudence has long recognized that the right to make an arrest . . . carries with it the right to use some degree physical coercion or threat of physical force to effect custody.'" Id. (quoting Graham, 490 U.S. at 396). But it is equally true that "[a] claim of excessive force turns on whether the officer's actions were 'objectively reasonable' in light of the totality of the circumstances," Gradisher v. City of Akron, 2015 WL 4502308, at *8 (6th Cir. July 25, 2015), and at this juncture, the Court must "view all evidence in the light most favorable to" Plaintiff and "draw[] all justifiable inference in [his] favor[.]" Ondo v. City of Cleveland, 2015 WL 4604860, at *3 (6th Cir. 2015).

When the facts are so construed, the factors that go into the reasonableness calculation under

7

Graham present a jury question on whether any force was necessary. Under Plaintiff's version of events, he was merely standing in his own yard and had committed no crime. While Plaintiff had his fingertips in his pockets and this may have been viewed as a threat to the safety of the officers, Plaintiff claims that he had removed his hand as instructed before the officers decided to throw him to the ground. Further, although Plaintiff admits there was a "struggle," he claims that he was merely trying to maintain his balance and did not resist arrest.

Similarly, when the facts are construed in Plaintiff's favor, the Court cannot say as a matter of law that it was objectively reasonable for Deputy Clouse to tase him. See, Marvin v. City of Taylor, 509 F.3d 234, 246 n.6 (6th Cir. 2007) ("[I]t is a pure question of law for the court to determine whether, viewing the facts in the light most favorable to the plaintiff, the officers' actions were objectively reasonable under the circumstances"). While Defendants claim that Plaintiff "refused to comply to be handcuffed" and therefore "a taser was deployed one time (5 seconds) to his back," Plaintiff claims that he was merely lifting up in an attempt to free his "badly injured" right arm, which would be in keeping with Defendants' instructions that he place his hands behind his back so he could be handcuffed.

The inquiry does not end, however, because Defendants have invoked qualified immunity as an affirmative defense. Qualified immunity shields "government officials performing discretionary functions . . . from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). The qualified immunity inquiry involves determining (1) whether a constitutional violation occurred and (2) whether the right infringed was clearly established. McKinley v. City of Mansfield, 404 F.3d 418, 429-30 (6th Cir. 2005). A court

is to use its "sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." Pearson v. Callahan, 555 U.S. 223, 236 (2009).

"When the defense of qualified immunity is raised, it is the plaintiff's burden to prove that the state officials are not entitled to qualified immunity." Ciminillo v. Streicher, 434 F.3d 461, 466 (6th Cir. 2006). Preliminarily, "plaintiff has the burden of showing that a right is clearly established." Everson v Leis, 556 F.3d 484, 494 (6th Cir. 2009).

Defendants note that an official's conduct violates a clearly established right only when the contours of that right are sufficiently clear such "that every 'reasonable official would have understood what he is doing violates that right,'" Ashcroft v. Al-Kidd, 131 S. Ct. 2074, 2083 (2011) (citation omitted), and "[t]his doctrine 'gives government officials breathing room to make reasonable but mistaken judgments,' and 'protects all but the plainly incompetent or those who knowingly violate the law," Carroll v. Carman, 135 S. Ct. 348, 250 (2014) (citation omitted). Defendants then write:

> In this particular case, Hillis refused to comply with a reasonable request of Deputy Phipps to show his hands for officer security. He then turned confrontationally and in a threatening manner toward Deputy Phipps and was placed under arrest. A traditional "take down" was employed, but Hillis resisted. No case has held that it violates an individual's constitutional rights to avoid a traditional take down to the ground when an individual resists.

(Docket No. 21 at 12).

Even in the context of a motion for summary judgment on qualified immunity grounds, however, the Court must view the facts in a light most favorable to Plaintiff. Webb v. United States, 789 F.3d 647, 659 (6th Cir. 2015). When so viewed a jury question exist because Plaintiff claims not to have had time to comply with the first request before again being ordered to remove

9

his hands from his pockets, and that he complied with the second command but was nevertheless pounced on. Simply put, the picture Plaintiff paints is that the Deputies Phipps and Frizzell (and in particular the former) were hell-bent on showing him who was in charge. It will be for the jury to determine whether their actions were justified.

As for Deputy Clouse, who was not involved in the original takedown but came over after hearing the fracas, Defendants argue that she "is entitled to be dismissed on qualified immunity – at the least" because Plaintiff "was actively resisting arrest and was warned prior to the deployment of the taser." (Docket No. 21 at 24). They further argue that "no case has held that the use of a taser, one time, to assist in bringing a resistant prisoner under control has violated an individual's constitutional rights." (Id. at 13).

In support of their argument, Defendants rely heavily on the Sixth Circuit's decision in Cockrell v. City of Cincinnati, 468 F. App'x 491, 495 (6th Cir. 2012), where the court was presented with the question of "whether a misdemeanant, fleeing from the scene of a non-violent misdemeanor, but offering no other resistance and disobeying no official command, had a clearly established right not to be tased on July 3, 2009." Canvassing the law in the area, the court observed that "cases addressing qualified immunity for taser use fall into two groups":

> The first involves plaintiffs tased while actively resisting arrest by physically struggling with, threatening, or disobeying officers. In the face of such resistance, courts conclude either that no constitutional violation occurred, or that the right not to be tased while resisting arrest was not clearly established at the time of the incident.
> \*         \*         \*
> In the second group of cases, a law-enforcement official tases a plaintiff who has done nothing to resist arrest or is already detained. Courts faced with this scenario hold that a § 1983 excessive-force claim is available, since "the right to be free from physical force when one is not resisting the police is a clearly established right."

Id. (citation omitted) (collecting cases).

Under the law in this circuit, "[i]f a suspect actively resists arrest and refuses to be handcuffed, officers do not violate the Fourth Amendment by using a taser to subdue him." Hagans v. Franklin Cnty. Sheriff's Office, 695 F.3d 505, 509 (6th Cir. 2012). On the other hand, suspects about to be tased should be given a warning, and the "tasing of [a suspect] before giving [him] and opportunity to comply with instructions [i]s a violation of clearly established law." Baker v. Union Twp., 587 Fed. App'x 229, 236 (6th Cir. 2014); see also Bennett v. Krakowski, 671 F.3d 553, 562 (6th Cir. 2011) (citation and internal quotation marks omitted) ("absent some compelling justification—such as the potential escape of a dangerous criminal or the threat of immediate harm—the use of a stun gun on a non-resistant person is unreasonable").

In this case, a factual issue exists as to whether Plaintiff was struggling when he was tased. The record shows that literally seconds passed between the time he was taken to the ground and tased, and, accordingly to Plaintiff's version of events, he was merely trying to lift up and free his right arm (as instructed) when he was tased.

It may be, as Defendants argue, that Plaintiff was "the author of his own misfortune." (Docket No. 21 at 8). As noted at the outset, however, there are two sides to this story, neither of "which is blatantly contradicted by the record so that no reasonable jury could believe it[.]" Scott v. Harris, 550 U.S. 372, 380 (2007). Thus, it necessarily falls on the jury to write the final chapter of the story.

### IV. Conclusion

On the basis of the foregoing, Defendants' Motion for Summary will be granted with respect to Plaintiff's illegal arrest claim, but denied with respect to his excessive force claim.

An appropriate Order will enter.

_____
KEVIN H. SHARP
UNITED STATES DISTRICT JUDGE